JOURNAL ENTRY AND OPINION
At the close of plaintiff-appellant William C. Whitler's case in chief on claims of intentional false imprisonment and42 U.S.C. § 1983 violations made against appellees Cuyahoga County and Sheriff Gerald T. McFaul, Judge Thomas Patrick Curran granted a directed verdict in favor of McFaul and the county. Whitler asserts that the judge erred: (1) by allowing McFaul and the county to file the answer to his complaint, with an affirmative defense of qualified immunity pursuant to R.C. 311.05, after Whitler rested his case; (2) by failing to order McFaul to produce a material witness; (3) by granting the motion for directed verdict after improperly weighing the evidence; and (4) by precluding the fair resolution of the merits at trial through "prejudging" the case and "formulat[ing] a preconceived notion of the result." We disagree and affirm.
In June 1992, Whitler was under sentences of probation for two misdemeanor domestic violence offenses against his ex-wife: one imposed by the Lakewood Municipal Court, the other by the Cuyahoga County Common Pleas Court. Maura Mueller, his probation officer for the Lakewood court, also supervised his probation for the common pleas court. Because Whitler had missed several reporting dates, she caused arrest warrants for probation violations to be issued by both Lakewood and the county.
Whitler was arrested on the Lakewood capias on July 1, 1992, and appeared before Judge Patrick Carroll the following day. At that hearing, he was granted a continuance until July 10, 1992, to obtain counsel and was released on his own recognizance. As a result of the county capias, Lakewood police kept him in custody and, later that day, the Cuyahoga County Deputy Sheriffs took Whitler from Lakewood and booked him into the Cuyahoga County Jail.
On July 15, 1992, Whitler appeared before Judge Joseph McManamon at a hearing on that probation violation. The judge found him to be a probation violator, terminated both Whitler's probation and sentence, entered an order referring Whitler to Lakewood for whatever actions deemed proper by the Lakewood Municipal Court and ordered Whitler be "remanded to Cuyahoga County Jail for Lakewood authorities."
Michael Bajorek of the Cuyahoga County Probation Department notified Mueller, by letter, that Whitler's probation had been terminated and he was to be turned over to Lakewood authorities. Whitler remained in the jail until August 12, 1992 when, as a result of a letter from Mueller explaining that Lakewood had no "holders" on Whitler and was awaiting his release, Judge McManamon issued a court order dated August 11, 1992 and filed August 13, 1992, requiring Whitler's release forthwith.
On July 15, 1993, Whitler filed suit against McFaul, Cuyahoga County and several John Doe sheriff's department employees, alleging negligent and intentional false imprisonment, and violations of Section 1983, Title 42, U.S. Code. The answer of McFaul and the county was a general denial and affirmative defenses of sovereign immunity, qualified immunity, good faith immunity, actions under court order, Civ.R. 12(B)(6), and Civ.R. 19. Whitler failed to amend his complaint to properly identify and serve the three "John Does" before July 15, 1994. This complaint was voluntarily dismissed under Civ.R. 41(A)(1) on January 18, 1995, and refiled on January 16, 1996.
McFaul and the County did not file an answer to this second complaint but, rather, filed a motion for summary judgment on May 30, 1996. Again, the "John Doe" defendants were never identified in an amended complaint or personally served. Judgment in favor of McFaul and the County on Whitler's negligence claim was granted on July 29, 1996, and the judge dismissed the remaining counts with prejudice on October 28, 1996. Whitler appealed.
In Whitler v. McFaul (1997), 123 Ohio App.3d 199,703 N.E.2d 866, appeal not allowed (1998), 81 Ohio St.3d 1457,690 N.E.2d 550, we concluded that R.C. Chapter 2744 did not provide Whitler with an exception from immunity for alleged acts of negligence by McFaul and the County because the act of detaining an individual at a county jail constituted a governmental function rather than a proprietary function. We further held that Whitler need not seek habeas corpus relief before bringing a § 1983 action and noted that a question of fact existed on deprivation of Whitler's constitutional rights and "as to whether the continuation of confinement under these circumstances rises to the level of `intentional conduct' for which [defendants] would be liable."Whitler, at 206. On October 27, 1997. we reversed in part and remanded for further proceedings.
At an April 28, 1998 pretrial, the case was scheduled for trial on August 3, 1998, and a discovery deadline for answers to interrogatories, answers to requests for admissions, and responses to requests for production of documents set for June 1, 1998. On June 25, 1998, Whitler filed his motion to compel answers to interrogatories and production of documents, acknowledging receipt on June 11, 1998 of only partial answers and requesting an extension of the discovery deadline. McFaul did not file a response to the motion and, at the pretrial held on July 27, 1998, was ordered to respond more fully to Whitler's requests. The transcript reveals that McFaul produced the requested discovery on July 29, 1998, five days before trial.
Before the start of trial on August 3, 1998, Whitler's lawyer pointed out that, although McFaul and the county had filed a motion for summary judgment in response to Whitler's complaint, no answer had ever been filed. On that basis, he argued, all of their defenses, including affirmative defenses, were waived. He specifically pointed to R.C. 311.05, which provides a sheriff with qualified immunity for the "neglect of duty or misconduct in office" of his deputies, explaining that he had no knowledge that McFaul would raise that specific defense until he received McFaul's trial brief on July 31, 1998. In the alternative, he argued, R.C. 311.05 would not apply because false imprisonment is an intentional tort.
In response, McFaul's lawyer, an assistant county prosecutor, apologized to the judge and indicated that he had inadvertently mistaken the answer from the first case for one he thought he had filed in the pending case. Whitler's lawyer agreed he had filed the exact complaint in both actions. The judge then granted McFaul's oral motion for leave to file an answer instanter, which was a copy of the answer filed in the 1993 case and contained the six affirmative defenses referenced, supra, including that "defendants are immune under the doctrine of qualified immunity."
At trial Whitler testified that, on July 17, 1992, he contacted the court-appointed lawyer who handled his hearing before Judge McManamon and told him he had not been released from the jail. According to Whitler, the lawyer replied that, because he was court appointed, he no longer had anything to do with the case but, nevertheless, promised to look into it. Whitler also contacted his mother, asking her to contact Mueller. He claimed that he was unable to contact anyone else by telephone about his continued incarceration because the only calls he could make from the jail were collect calls.
In addition to his telephone calls, Whitler also testified he complained verbally and in writing to the guards "at least every couple of days," telling them that there were no warrants for his arrest and asking them to find out why he was still in jail. He also claimed to have requested the help of a priest and a social worker. After three or four weeks of waiting, the guards gave him a "kite." A "kite," according to the testimony of Deputy Sheriff David E. Miller, was a formal "interoffice-type memo" wherein an inmate might, for example, request to see a chaplain, ask for a haircut, or inquire as to why the inmate was still incarcerated in the jail when he had been sentenced to a half-way house. The August 8, 1992 "kite" composed by Whitler on a specific form asked an unnamed social worker why he was still in the jail, given that the case was dismissed on July 15th and that Lakewood authorities did not have a holder on him. Although Whitler said that he spoke to a social worker a couple of times, the "kite" does not indicate that the Sheriff's Department Division of Inmate Services took any action upon it. Whitler also acknowledged that he did not believe that either McFaul or any Cuyahoga County Commissioner specifically knew that he was in jail and he never requested anyone outside of the jail to contact McFaul.
Mueller testified that she received multiple telephone calls from Whitler's mother advising that her son was not being released from the jail and that they did not know why. Mueller repeatedly called Bajorek, and later Judge McManamon's bailiff, and asked them to look into the matter. She also reviewed the files of both the Lakewood Court and the Lakewood Police Department, and learned that there had been no holders or warrants placed upon Whitler. Bajorek finally suggested that Mueller write a letter to him and she complied. According to Mueller, when Bajorek received the letter, he took it to Judge McManamon and, within 24 hours, Whitler was released.
Mueller opined that, once the sheriff's department determined that the Lakewood authorities did not have a holder or outstanding warrants on Whitler, it should have communicated that information to Judge McManamon in order to obtain an amended order allowing for Whitler's release.
Miller admitted that deputy sheriffs are required to transport inmates to and from county correction centers and other institutions within the county; to pick up and deliver to appropriate persons all necessary journal entries, commitment papers, and other documents relating to persons transported; and to "provide information by telephone to law enforcement agencies concerning current jail inmates," among other things. Miller further stated that correction officers are required to distribute "kites" through the proper channels. Although Miller testified that he was, in fact, a corrections officer, he did not know where or to whom a corrections officer would turn in a "kite." McFaul, on the other hand, indicated that "kites" would go through the supervisors and then to the appropriate person. Miller also admitted that, although inmates often complained that they did not belong in jail, that did not give a guard the right to ignore an inmate's complaint.
Warden Robert Clark testified that based upon the order issued by Judge McManamon, he would be required to hold Whitler for the Lakewood authorities or until the judge issued an order releasing him from custody. Lieutenant Robert Buchner of the Sheriff's Department testified that upon disposition of an inmate's case by the judge, the courtroom deputy first would complete a RTA slip and then transfer the information to either a commit or release slip. The RTA slip in this instance completed by "Deputy Jones" shows the deputy had circled the word "commit" and noted "Deft. Ordered Remanded to Lakew [sic]. Lakewood P.D." Beuhner said that this information would then be given to sheriff's employees for further handling. Clark admitted that the RTA slip, while not part of the sheriff's policies and procedures and not a legal document, could be used for initiating a release before a court order was legally valid.
Clark also indicated that, in addition to verifying release documents, the sheriff's department was also required to determine whether another authority had placed a hold upon the inmate. In spite of Clark's testimony, Buehner admitted that he did not know how another jurisdiction would discover whether the sheriff's department was holding an inmate for which the other jurisdiction had a "holder." He opined that it was the responsibility of an inmate's attorney to notify the other authorities.
McFaul said that the department did not have a specific policy or procedure regarding a situation where a person protests his confinement. He noted, however, that it was not the responsibility of the sheriff's department to notify another jurisdiction that they are holding an inmate for them because those jurisdictions have their own police departments, probation officers, etc., who "follow up" on an inmate. He admitted that in the present case "it probably wouldn't have been a bad idea [to call the Lakewood authorities], but there is no pattern of that. We don't do that." He later said that the sheriff's department did not make such calls because "[t]here is nothing saying I have to." However, with regard to the transport of prisoners to state correctional institutions, after remand and sentencing, he believed that department employees did, in fact, contact those institutions to inform them of the transport.
McFaul also conceded that he was ultimately responsible for policies and procedures used by employees in the sheriff's department and for the release or commitment of an incarcerated individual in the county jail. He contended, however, that he did not make up the policies. As the administrator, he delegated the policy-making authority to various department directors "[s]o everybody writes policies to suit their own departments, what is best for the operation of their department." As long as the policy was "costworthy," he would approve it. McFaul stated that he was unaware that a person could be released from jail without a proper journal entry. He did acknowledge, however, that Whitler had been released from prison on August 11, 1992 even though the order was not journalized and therefore invalid until August 13, 1992.
Beuhner also testified that McFaul was an elected official and, although the sheriff's department received its funding through the Cuyahoga County Commissioner's Office, neither he nor McFaul worked for the commissioners.
At the conclusion of testimony on the second day of trial, the assistant prosecutor moved for a directed verdict. After oral arguments, the judge granted the motion and rendered the following decision in a journal entry:
 Motion for directed verdict at conclusion of plaintiff's case is granted on both counts:
 a) 1983 count: insufficient evidence to present prima fade case[;]
 b) false imprisonment count: insufficient evidence and ORC § 311.05.
It is from this order Whitler appeals.
Whitler's first assignment of error states:
 I. THE TRIAL COURT ERRED WHEN IT GRANTED DEFENDANT-APPELLEES' MOTION FOR DIRECTED VERDICT ON THE BASIS OF R.C. 311.05
REGARDING PLAINTIFF'S STATE LAW CLAIM FOR FALSE IMPRISONNENT WHEN:
 i. DEFENDANT-APPELLEE[S] WAIVED THE ALLEGED AFFIRMATIVE DEFENSE [CONTAINED IN R.C.] 311.05
 ii. DEFENDANT-APPELLEE[S] DID NOT FILE AN ANSWER OR SHOW EXCUSABLE NEGLECT
 iii. ALLEGED AFFIRMATIVE DEFENSE MUST BE SEPARATELY PLED FROM GENERAL CIV.R. 12(B)(6) DENIAL
 iv. R.C. 311.05 IS NOT AN AFFIRMATIVE DEFENSE BUT IMPOSES LIABILITY UPON A COUNTY SHERIFF.
Whitler argues the judge erred in granting McFaul and the county's oral motion to file an answer instanter on the morning of trial and failing to have the order journalized until after
the close of his case. In addition, he claims that the judge erred in granting in part the motion for directed verdict based upon R.C. 311.05 because that affirmative defense had not been pleaded at any time and was not mentioned until the Friday before the Monday trial. Whitler contends that even if the answer were properly filed, R.C. 311.05 was not specifically pleaded as required by the rules of civil procedure. Finally, he asserts that R.C. 311.05 does not constitute an affirmative defense but, rather, imposes liability upon the sheriff for the acts of his employees.
McFaul and the county do not address all of the arguments asserted by Whitler. Rather, they generally claim that nothing in the rules of civil procedure sets a time limit before which an affirmative defense may be pleaded. They do concede, however, that there is no precedent for finding R.C. 311.05 to be an affirmative defense.
We examine this assignment of error using a two-part analysis: (1) whether it is error to grant an oral motion to allow an answer to be filed on the morning of trial and to then journalize the order after trial; and (2) whether it is error to assert R.C.311.05 as an affirmative defense. Had the judge foreclosed McFaul or the county from asserting these defenses, Whitler contends, he would have prevailed on his false imprisonment claim.
In the present case, the judge utilized the provisions of Civ.R. 55(D) as a basis for granting the oral motion to file an answer instanter. That rule prohibits a default judgment against "this state, a political subdivision, or an officer in his or her representative capacity or an agency of either, unless the claimant has established a claim or right to relief by evidence satisfactory to the court." Civ.R. 55; State ex rel. YoungstownCity School Dist. Bd. of Edn. v. Youngstown (1998), 84 Ohio St.3d 51,53, 701 N.E.2d 986. A judge must, therefore, look beyond the simple admissions resulting from a failure to serve a responsive pleading. Id., citing State ex rel. Shimola v. Cleveland (1994),70 Ohio St.3d 110, 112, 637 N.E.2d 325, 326; State ex rel.Strothers v. Fuerst (1997), 120 Ohio App.3d 305, 306,697 N.E.2d 1063. In other words, "[a]lthough the averments in the [claimant's] complaint may be taken as true, the court is not required to automatically enter default judgment against a political subdivision for failing to answer." McGowan v. CuyahcgaMetro. Housing Authority (Jan. 15, 1998), Cuyahoga App. No. 72083, unreported, 1998 WL 12360. It is clear, however, that Civ.R. 55(D) does not provide a judge with justification to allow a political subdivision or officer thereof to file an untimely answer.
While Civ.R. 12(A)(1) provides that a defendant shall serve the answer within twenty-eight days after service of the summons and complaint, Civ.R. 6(B)(2) provides that "[w]hen by these rules * * * an act is required or allowed to be done at or within a specified time, the court for cause shown may at any time in its discretion * * * upon motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect[.]" The determination of the judge will not be disturbed on appeal absent an abuse of that discretion. State ex rel. Lindenschmidt v. Butler Cty. Bd. ofCommrs. (1995), 72 Ohio St.3d 464, 465, 650 N.E.2d 1343; Zimmerlyv. Cleveland Clinic Found. (June 30, 1998), Cuyahoga App. No. 73104, unreported. "The term discretion itself involves the idea of choice, of an exercise of the will, of a determination made between competing considerations." (Citations omitted). In order to have an abuse of that choice, the result must be so palpably and grossly violative of fact or logic that it evidences not the exercise of will but the perversity of will, not the exercise of judgment but the defiance of judgment, not the exercise of reason but instead passion or bias. Nakoff v. Fairview General Hospital
(1994), 75 Ohio St.3d 254, 256, 662 N.E.2d 1, 3 citing State v.Jenkins (1984), 15 Ohio St.3d 164, 222, 473 N.E.2d 264, 313.
When a judge determines whether neglect is excusable, he must take into consideration all of the surrounding facts and circumstances, while remaining "mindful of the admonition that cases should be decided on their merits, where possible, rather than procedural grounds." Lindenschmidt, supra at 466. Previously, this court has concluded that, even if a defendant has not provided an explicit reason for a delay in filing an answer, we would not find that a judge abused his discretion when he granted leave to file the answer where the plaintiff failed to show prejudice resulting from the delay in filing the answer.Zimmerly and McGowan, supra.
In the present case, the assistant prosecutor asserted that he mistakenly believed he had answered the complaint as he had done in the previously filed action. It even appears that Whitler's lawyer was unaware of the oversight until three days before trial. In addition, both Whitler's lawyer and the judge noted that both complaints were identical. Based upon these few facts, we cannot conclude the judge abused his discretion in granting the motion to file an answer instanter, pursuant to Civ.R. 6(B)(2), despite the fact that the order itself was journalized and the answer time-stamped after the close of Whitler's case in chief.
We must still address the question whether the judge erred in allowing R.C. 311.05 as an affirmative defense. The Supreme Court has concluded that "[a]n affirmative defense is a new matter which, assuming the complaint to be true, constitutes a defense to it." State ex rel. The Plain Dealer Pub. Co. v. Cleveland
(1996), 75 Ohio St.3d 31, 33, 661 N.E.2d 187. "`An affirmative defense is any defensive matter in the nature of a confession and avoidance. It admits that the plaintiff has a claim (the "confession") but asserts some legal reason why the plaintiff cannot have any recovery on that claim (the "avoidance").' (Footnote omitted.)" Id., quoting 1 Klein, Browne Murtaugh, Baldwin's Ohio Civil Practice (1988), 33, T 13.03.
Statutory immunity is an affirmative defense, which is waived if not raised in a timely fashion. Turner v. Central Local Sch.Dist. (1999), 85 Ohio St.3d 95, 97, 706 N.E.2d 1261. A party, through his lawyer, shapes the trial through the issues he selects for resolution; the party cannot expect either the judge or opposing counsel to anticipate the existence of an argument that is not raised. Id. at 99. It is prudent, therefore, as a tactical matter, for both a party and his lawyer to plead all defenses as early in the litigation as possible. Id. at 98-99.
R.C. 311.05 holds a sheriff liable, under certain limited circumstances, for the acts of his or her deputies. See Young v.Summit Cty. (1990), 67 Ohio App.3d 661, 705, 588 N.E.2d 169
(without discussion, determines that § 311.05 imposes respondeat superior liability), motion to certify the record overruled (1990), 55 Ohio St.3d 705, 562 N.E.2d 898. The language of that section provides as follows:
 The sheriff shall only be responsible for the neglect of duty or misconduct in office of any of his deputies if he orders, has prior knowledge of, participates in, acts in reckless disregard of, or ratifies the neglect of duty or misconduct in office of the deputy.
"Misconduct in office" has been defined as "[a]ny unlawful behavior by a public officer in relation to the duties of his office, willful in character." Black's Law Dictionary 901 (5th
Ed., 1979). The "[t]erm embraces acts which the officer holder had no right to perform, acts performed improperly, and failure to act in the face of an affirmative duty to act." Id. In essence, "misconduct in office" denotes an "intentional" act rather than a mere "negligent" act.[1]
"An intentional tort is an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." Jones v. VIP Development Co.
(1984), 15 Ohio St.3d 90, 472 N.E.2d 1046, paragraph one at syllabus. A specific intent to injure is not necessary to a finding of intentional misconduct. Id. at 95.
Based upon the foregoing, it is clear that R.C. 311.05 is not an affirmative defense because its application does not constitute both an admission and avoidance of liability. See ThePlain Dealer Pub. Co., 75 Ohio St.3d at 33. Rather, it provides an exception from non-liability because it holds a sheriff responsible for both negligent and intentional tortious acts "of any of his deputies if he orders, has prior knowledge of, participates in, acts in reckless disregard of, or ratifies the neglect of duty or misconduct in office of the deputy." This language, in other words, requires the claimant, rather than the sheriff, to put forth evidence showing a degree of "intent" on the part of the sheriff as it applies to the negligent or intentional conduct of his deputies in order to hold the sheriff individually liable for such conduct. Therefore, although we conclude that R.C. 311.05 is not an affirmative defense, we cannot find error in the application of that section to this action.
That having been said, this court must still address the question whether the trial judge erred in directing a verdict on the false imprisonment claim against the sheriff based upon either insufficient evidence or R.C. 311.05. In order to properly do so, we must first address some of the issues raised by Whitler in his second and third assignments of error: whether the judge correctly determined that Whitler failed to prove a prima facie
case and properly directed a verdict on the false imprisonment claims. To do so, we will consider Whitler's second and third assignments of error together.
 II. THE TRIAL COURT ERRED WHEN IT GRANTED DEFENDANT-APPELLEE, CUYAHOGA COUNTY'S MOTION FOR DIRECTED VERDICT ON THE STATE LAW CLAIM AND BOTH DEFENDANT-APPELLEES' CUYAHOGA COUNTY AND SHERIFF McFAUL'S MOTION FOR DIRECTED VERDICT ON THE FEDERAL LAW CLAIMS.
 III. THE TRIAL COURT IMPROPERLY WEIGHED THE EVIDENCE AND THE CREDIBILITY OF WITNESSES AND DID NOT GIVE PLAINTIFF-APPELLANT THE BENEFIT OF ALL REASONABLE INFERENCES IN SUPPORT OF HIS CLAIM WHEREIN REASONABLE MINDS COULD REACH DIFFERENT CONCLUSION WHERE THE TRIAL COURT IMPROPERLY GRANTED DEFENDANT-APPELLEES' MOTION FOR DIRECTED VERDICT AS TO PLAINTIFF-APPELLANT'S MOTION FOR DIRECTED VERDICT AS TO PLAINTIFF-APPELLANT'S FALSE IMPRISONMENT STATE LAW CLAIM AND FEDERAL CLAIM UNDER 42 U.S.C. SECTION 1983 ON THE ERRONEOUS CONCLUSION THAT PLAINTIFF-APPELLANT COULD ONLY BE RELEASED PURSUANT TO A JOURNAL ENTRY OF THIS COURT.
Given Whitler's allegedly repeated inquiries regarding why he was detained after July 15, 1992, the question remains whether the failure to investigate his claims of illegal detention, and failure to contact the Lakewood authorities, may be considered unreasonable such as to rise to the level of intentional conduct. Whitler points out that Warden Clark gave conflicting testimony about whether an inmate could be discharged without a valid court order and suggests McFaul's contention that he could not have been released from jail without a court order, even if McFaul had wanted to release him, is without merit.
Whitler also argues that the county does not have either absolute or qualified immunity from respondeat superior liability for the violation of § 1983. Rather, the county is liable for the policies, procedures, and customs of the sheriff's department, as authorized by Sheriff McFaul, which result in or cause constitutional torts. Whitler points out that the sheriff's department does not have any procedure for a situation where an inmate complains that he should be released because there are no wants or warrants to detain him, even though inmates often complain that they are innocent and do not belong in jail. Moreover, he submits, since McFaul admitted that he was responsible for the actions or inactions of his employees, their failure to contact the Lakewood authorities, when they are charged with the responsibilities of other institutions, resulted in a factual question for the jury to consider.
McFaul and the county counter that Whitler was taken into custody pursuant to a lawful court order and that the Cuyahoga County Probation Department notified the "Lakewood authorities,"i.e., Mueller, his probation officer, that Whitler was being held in county jail. Moreover, they argue, "[t]he fact that so many inmates complain of false imprisonment only goes to show that such complaints must be carefully examined; an inmate may not be released without more (proof). The volume of such complaints would make it impossible to resolve each one with immediacy if that duty is imposed upon the Sheriff's Department."
With regard to the § 1983 claim, they argue, the mere failure to call Lakewood authorities did not constitute a "policy" for which the sheriff would be liable as a constitutional tort. Moreover, they claim, there was no proof that someone of authority actually made a conscious decision not to call the Lakewood authorities or to disregard Whitler's complaints.
When a party has made a motion for directed verdict pursuant to Civ.R. 50(A), the judge must construe the evidence most strongly in favor of the party against whom the motion is directed. A motion for a directed verdict tests the legal sufficiency of the evidence to support a prima facie claim, and therefore presents a question of law. Grau v. Kleinschmidt (1987), 31 Ohio St.3d 84,90, 509 N.E.2d 399; see, also, Dimora v. Cleveland Clinic Found.
(1996), 114 Ohio App.3d 711, 716, 683 N.E.2d 1175. The judge may not weigh the evidence nor test the credibility of the witnesses but must give to the party opposing the motion the benefit of all reasonable inferences from the evidence. Zavasnik v. LyonsTransp. Lines, Inc. (1996), 115 Ohio App.3d 374, 378,685 N.E.2d 567; see, also, Strother v. Hutchinson (1981), 67 Ohio St.2d 282,284, 423 N.E.2d 467. The judge shall direct a verdict in favor of the moving party only after he has found "that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted [by the nonmoving party] and that conclusion is adverse to the [nonmoving party.]" Civ.R. 50(A)(4). Where there is substantial, competent evidence favoring the nonmoving party so that reasonable minds might reach different conclusions, the motion must be denied. Ramage v. Cent.Ohio Emergency Serv., Inc. (1992), 64 Ohio St.3d 97, 109,592 N.E.2d 828.
False Imprisonment
To establish a prima facie case of intentional false imprisonment, a plaintiff must show that the defendant intentionally confined him within a limited area, both without lawful privilege and without the plaintiff's consent. Felicianov. Kreiger (1977), 50 Ohio St.2d 69, 71, 362 N.E.2d 646, citing 1 Harper and James, The Law of Torts, 226, Section 3.7 (1956). The Supreme Court has recognized the continuing nature of the "confinement" element of this tort in State ex rel. Kemper v.Beecher (1847), 16 Ohio 358, 363, when it stated that "each day's continuance of the body of a person in custody, is a distinct trespass, and may be treated as such."
 Because of the continuing nature of the false imprisonment tort, it is clear that a person who intentionally confines another cannot escape liability by arguing that he or she was initially privileged to impose the confinement. Once the initial privilege expires, the justification for continued confinement expires and possible liability for false imprisonment begins. See Leger v. Warren (1900), 62 Ohio St. 500, 57 N.E. 506, paragraph one of the syllabus; 1 Restatement of the Law 2d, Torts (1965) 67, Section 45 ("If the actor is under a duty to release the other from confinement, his refusal to do so with the intention of confining the other is a sufficient act of confinement to make him subject to liability."). * * * [I]n the absence of an intervening justification, a person may be found liable for the tort of false imprisonment if he or she intentionally continues to confine another despite knowledge that the privilege initially justifying that confinement no longer exists.
Bennett v. Ohio Dept. of Rehab. Corr. (Ohio 1991), 60 Ohio St.3d 107,109-110, 573 N.E.2d 633.
Judge McManamon's order found Whitler to be a probation violator, terminated his probation and sentence and referred Whitler to "Lakewood for whatever action deemed proper by Lakewood Municipal Court. Defendant remanded to Cuyahoga County Jail for Lakewood authorities." The sheriff's department then had the "privilege" to hold Whitler for the Lakewood authorities. However, Whitler testified that he complained orally and in writing to the corrections officers with whom he had contact during his 29-day incarceration that the Lakewood authorities — those for whom the sheriff's department held him — did not have any wants or warrants on him. Whitler also submitted proof that a deputy sheriff, pursuant to departmental policy, is charged with the responsibility to "provide information by telephone to law enforcement agencies concerning current jail inmates," in addition to opinion testimony regarding the ease with which the sheriff's employees could have discerned that Whitler should not have been held in custody.
To that extent, Whitler has shown that the sheriff's employees should have been aware, upon the adherence to departmental policy, that the privilege to hold Whitler in custody had expired. Therefore, construing the evidence most strongly in favor of Whitler, it is clear that Whitler could have presented aprima facie case against the various unidentified sheriff employees for the false imprisonment claim.
In order to support a claim against Sheriff McFaul, however, Whitler must have set forth substantial, competent evidence to show that McFaul ordered, had prior knowledge of, participated in, acted in reckless disregard of, or ratified the alleged neglect of duty or misconduct in office of these unidentified employees.
We conclude that Whitler did not present substantial, competent evidence to show that McFaul would be liable for the omissions of his employees. In addition, "[n]egligence or inaction alone is insufficient to show ratification of an agent's unauthorized act[;] * * * ratification must follow knowledge of the facts." Morrv. Crouch (1969), 19 Ohio St.2d 24, 25, 249 N.E.2d 780. We cannot say that McFaul's lack of knowledge surrounding the policies and procedures of his department is enough to show that he has ratified the allegedly wrongful acts of his employees. Therefore, Whitler has not presented substantial, competent evidence to show that reasonable minds might reach different conclusions regarding whether Whitler has satisfied the requirements found in R.C.311.05 imposing liability on a sheriff.
Finally, Whitler has not shown that Cuyahoga County is vicariously liable through the doctrine of respondeat superior
for the allegedly intentional wrongful acts of employees of the sheriff's department. "In order for an employer to be held liable under the doctrine of respondeat superior, the tort of the employee must be committed within the scope of employment. In addition, where the tort is intentional, the behavior giving rise to the tort must be calculated to further and/or promote the business." Kuhn v. Youlten (1997), 118 Ohio App.3d 168, 176,692 N.E.2d 226, citing Byrd v. Faber (1991), 57 Ohio St.3d 56, 58,565 N.E.2d 584. Whitler alleged that John Doe I or John Doe II were employed by McFaul but only John Doe III was employed by both McFaul and the county. Having never identified Doe III or what he may have done relative to the alleged false imprisonment, Whitler did not prove that the county would be responsible under the theory of respondeat superior. There was no error in directing a verdict in favor of the county on the tort claim.
Section 1983. Title 42. U.S. Code
Section 1983, Title 42, U.S. Code, provides a remedy to persons whose federal rights have been violated by governmental officials. Monroe v. Pape (1961), 365 U.S. 167, 81 S.Ct. 473,5 L.Ed.2d 492, overruled on other grounds in Monell v. Dept. ofSocial Services of City of New York (1978), 436 U.S. [550 N.E.2d 459] 658, 98 S.Ct. 2018, 56 L.Ed.2d 611. Section 1983 provides as follows:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
This requires the claimant to establish two elements: "(1) the conduct in controversy must be committed by a person acting under color of state law, and (2) the conduct must deprive the plaintiff of rights, privileges or immunities secured by the Constitution or laws of the United States." 1946 St. Clair Corp.v. City of Cleveland (1990), 49 Ohio St.3d 33, 34,550 N.E.2d 456, citing Parratt v. Taylor (1981), 451 U.S. 527, 535,101 S.Ct. 1908, 1912-13, 68 L.Ed.2d 420. Supervisory personnel, however, may not be held liable under Section 1983 merely upon the application of the doctrine of respondeat superior. Monell,supra; Kinney v. Ohio Dept. of Administrative Services (1986),30 Ohio App.3d 121, 122, 507 N.E.2d 399 ("the liability of supervisory personnel must be based upon more than the mere right to control employees"). Such liability must be based upon a showing that the defendant "`either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official [against whom the claim is brought] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers [Alteration original].'" Guess v. Wilkinson (1997), 123 Ohio App.3d 430, 435,704 N.E.2d 328, quoting Hays v. Jefferson Cty. (C.A. 6, 1982),668 F.2d 869, 874.
The case of Monell v. Department of Social Services (1978),436 U.S. 658, 690-691, 98 S.Ct. 2018, 2035-2036, 56 L.Ed.2d 611, established the rule that a local governing body may be sued for monetary, declaratory, or injunctive relief under Section 1983 where "the action that is alleged to be unconstitutional implements or executes a policy, ordinance, regulation, or decision officially adopted and promulgated by that body's officers," or where the alleged unconstitutional action results from governmental "custom or usage" that has become so settled as to have the force of law.
The U.S. Supreme Court further described the term "official policy" in Pembaur v. Cincinnati (1986), 475 U.S. 469, 480-481,106 S.Ct. 1292, 1299-1300, 89 L.Ed.2d 452, as to refer to "formal rules or understandings — often but not always committed to writing — that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." While "policy" generally connotes a rule of general application, a decision "tailored to a particular situation" may also constitute a "policy" if made by the "official or officials responsible for establishing final policy with respect to the subject matter in question." Id. at 483-484,106 S.Ct. at 1300.
The identification of policymaking officials presents a question of state law which requires the examination of ordinances and regulations to determine the official or body that has the responsibility for final policymaking authority in a particular area. City of St. Louis v. Praprotnik (1987),485 U.S. 112, 124-125, 108 S.Ct. 915, 924-925, 99 L.Ed.2d 107. Such policymaking authority may be granted directly by legislative enactment or delegated by the person possessing such authority.Id. at 124, 108 S.Ct. at 924, citing Pembaur, 475 U.S. at 483,106 S.Ct. at 1300 (plurality opinion).
 In sum, for a municipality to be liable under Section 1983, several factors must be present: (1) the municipality must itself be responsible by either sanctioning or ordering the claimed constitutional violation; (2) the municipal actors must have "final" policymaking authority under state or municipal law (or have been delegated such) for that particular area of the [municipality's] business; and (3) the action taken must be pursuant to some policy adopted by the municipal actors exercising their policymaking authority.
Norwell v. Cincinnati (May 28, 1999), Franklin App. No. C-980366, unreported, 1999 WL 335025.
In the present case, Whitler may have established a prima facie
§ 1983 claim against the sheriff's employees since he has shown that they acted under the color of state law, e.g., R.C.311.04, R.C. 341.01-05, and the alleged wrongful act of detaining Whitler, when the authority to do so expired, violated his constitutional liberty right to "freedom of movement." Whitler presented evidence — upon which reasonable minds might reach different conclusions — that tended to show the following: (1) the sheriff's employees had reason to know that he was no longer wanted by the Lakewood authorities through his case file and his written notes; (2) the sheriff's department had released inmates, including Whitler, without a valid court order; and (3) the sheriff's department policy and practice required its employees to call other law enforcement agencies and institutions when it held an inmate wanted by or to be remanded to that authority. Such failure to investigate his claim of wrongful detention may amount to "deliberate indifference" of Whitler's rights. Douglasv. Murphy (E.D. Pa. 1998), 6 F. Supp. 430, 431-432; see, also,Battista v. Cannon (M.D. Fla. 1996), 934 F. Supp. 400, 404
(failure to investigate alleged acts of sheriff deputy which violated others' liberty interests and which occurred before claimant's alleged § 1983 injury may be sufficient to constitute liability).
Whitler, however, has failed to present a prima facie § 1983 claim against Sheriff McFaul. As we noted earlier in this opinion, supervisory personnel cannot be held liable under Section 1983 solely upon the application of the doctrine ofrespondeat superior. In order to impose liability, the claimant must show more: the supervisory personnel must have at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers. Douglas,6 F. Supp. at 431-432. In the present case, however, Whitler admitted that McFaul had no reason to know that he was being held unlawfully. Moreover, he did not provide any evidence that the lack of a set procedure for the investigation into all false imprisonment claims by inmates amounted to the tacit approval by McFaul to his employees' wrongful detainment of Whitler and others similarly situated. Beck v. City of Pittsburgh (C.A.3, 1996), 89 F.3d 966. There was, therefore, no error in directing a verdict in favor of McFaul on the § 1983 claim.
Finally, Whitler has also failed to present a prima facie § 1983 claim against Cuyahoga County. There is nothing to show that the county held the final rule-making authority or even delegated such to the sheriff's department regarding departmental policy and procedure. Pembaur, 475 U.S. at 481-484,106 S.Ct. at 1299-1300; see id. at 484 n. 12, 106 S.Ct. at 1300 n. 12. Therefore, the judge properly directed a verdict in favor of the county.
 IV. THE TRIAL COURT ERRED WHEN IT DID NOT ORDER DEFENDANT-APPELLEES TO PROVIDE IDENTIFICATION OF A MATERIAL WITNESS PURSUANT TO A MOTION TO COMPEL.
Whitler argues that the judge erred when he failed to require McFaul and the county to produce "Deputy Jones, #204" who signed the RTA slip after Whitler's July 15, 1992, hearing especially since his lawyer had no idea Jones existed until McFaul finally complied with the discovery order five days before trial. Whitler claims that Jones was a material witness because of his presence at that July 15, 1992 hearing and his duty to bring the RTA form to the clerk's office, and then to the release desk.
McFaul and the county claim no abuse of discretion because they did not dispute Jones' "pre-custody" involvement and, to that extent, Jones' testimony is not material. Moreover, they claim another deputy was available to testify regarding courtroom procedure, about which Jones would testify.
The record reveals that Whitler's lawyer served a subpoena upon "Deputy Jones, #204" at the sheriff's department the day after he received the supplemented discovery. According to the assistant prosecutor, no one named "Jones" with that badge number was currently employed in the department although there were "quite a few" in the department with the surname Jones. McFaul acknowledged that the department kept a list of the names of the deputies and their individual badge numbers, but there is nothing in the record to indicate that McFaul endeavored to determine the identity of "Deputy Jones #204" who worked on July 15, 1992. While the judge concluded that the sheriff's department had no control over a former employee, that would not excuse McFaul's apparent lack of effort to discern the identity of "Deputy Jones #204," given the last-minute compliance with the discovery order.
We cannot conclude that the judge's failure to require McFaul and the county to identify "Deputy Jones #204" resulted in prejudicial error. Whitler did not offer proof of specific relevant evidence, other than general courtroom procedure, that he hoped to elicit directly from Jones. A deputy was provided to testify on the specifics of the procedure utilized when a criminal defendant is returned to or released from custody. We conclude, therefore, that any error in failing to order McFaul and the county to adequately identify "Deputy Jones #204" was harmless. Civ.R. 61.
 V. THE TRIAL COURT ABUSED ITS DISCRETION'S [sic], PREJUDGED THE CASE, FORMULATED [A] PRECONCEIVED NOTION OF RESULT, AND THEREBY PRECLUDED FAIR RESOLUTION [OF THE CASE].
Whitler argues that the judge's comments made before and after the commencement of trial are evidence that he had prejudged the case, formulated a preconceived notion of the result and, thereby, precluded a fair resolution of the issues. McFaul and the county contend that Whitler should have filed an affidavit of prejudice and, having failed to do so, is precluded from suggesting such error.
The judge's comments cited by Whitler which allegedly reveal a "preconceived notion" of the trial's outcome appear to relate the judge's misunderstanding of our previous decision in Whitler,123 Ohio App. 3d at 206, regarding defendants' "qualified immunity" defense, rather than a "prejudgment" of the facts at issue. It is apparent that the judge concluded that Whitler, as a matter of law, was in jail pursuant to a lawful order of the court and, therefore, had no cognizable claim against McFaul and the county. Whitler, however, had submitted evidence both prior to and at trial which tended to support his theory that the sheriff's employees were apprised that the "privilege" to confine him no longer existed and, therefore, a question of fact remained as to whether, under the circumstances, the continuation of confinement rose to the level of "intentional conduct" for which McFaul and the county could be held liable. Whitler, 123 Ohio App.3d at 206. In other words, McFaul and the county's "objective legal reasonableness of following the order of the court" defense was a defense of qualified immunity subject to determination by the trier of fact. Contrary to what the judge believed, the application of the defense was not subject to determination as a matter of law. Id.
The authority upon which Whitler bases this assignment of error, Cleveland v. Shaffer (1996), 112 Ohio App.3d 631,679 N.E.2d 742, involved a criminal action tried before a judge, not the jury. In the Shaffer case, the defense attorney informed the judge, before the start of the bench trial, that the complaining witness had recanted her story about the defendant's domestic violence. The judge stated on the record that she was "lying" and that he did not "see a defense" to the charge. In that case, we noted these statements demonstrated that the judge had prejudged the case, formulated a preconceived notion of the result and, thereby, precluded a fair resolution on questions of credibility and weight of evidence. We concluded the judge had deprived Shaffer of fundamental due process and a fair trial.
Shaffer does not apply under the present circumstances. First, Whitler's action was tried to a jury and the judge made his allegedly objectionable statements outside the presence of the jury. Second, as noted earlier, the judge's statements show a misunderstanding of the law of the case rather than prejudgment of the facts. This assignment of error is overruled.
Judgment affirmed.
It is ordered that the appellees recover from appellant their costs herein taxed.
This court finds that there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JUDGMENT: AFFIRMED.
TIMOTHY F. McMONAGLE, P.J. and PATRICIA ANN BLACKMON, J. Concur.
 ________________________________ ANNE L. KILBANE, JUDGE
[1] See Brockman v. Bell (1992), 78 Ohio App.3d 508, 514-515,605 N.E.2d 445 ("As the probability increases that certain consequences will flow from certain conduct, the actor's conduct acquires the character of intent and moves from negligence toward intentional wrongdoing. See Pariseau v. Wedge Products, Inc.
(1988), 36 Ohio St.3d 124, 126, 522 N.E.2d 511, 516 (citing 1 Restatement of the Law 2d, Torts [1965] 15, Section 8A, Commentb). Therefore, the terms `wanton,' `willful' and `reckless,' as used to describe tortious conduct, might best be defined at points on a continuum between negligence, which conveys the idea of inadvertence, and intentional misconduct.")